**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FOX CONTROLS, INC., an Illinois  )
corporation,                      )
                                  )
          Plaintiff,              )
                                  )
          v.                      )        No. 02 C 346
                                  )
HONEYWELL, INC., a Delaware       )
corporation,                      )
                                  )
          Defendant.              )


**MEMORANDUM OPINION**

Before the court is defendant Honeywell, Inc.'s motion for summary judgment.  For the reasons explained below, the motion is granted in part and denied in part.

**BACKGROUND**

Plaintiff, Fox Controls, Inc. ("Fox Controls"), brought this action against Honeywell, Inc. ("Honeywell") in relation to Honeywell's use of training and sales materials created by Fox Controls.  Honeywell (and Micro Switch, a division of Honeywell) manufactures and sells machine safety products, such as light curtains, guards, and safety mats.  Fox Controls distributes machine safety products, including those of Honeywell, and also provides a variety of safety-related services: integration, training, audits, and installation.

The following is a brief summary of the undisputed facts underlying this action; other relevant facts will be set forth in the Discussion section of this opinion. In 1996, Honeywell began an initiative to develop a distinct business unit in North America (as it had done in Europe) that focused exclusively on the sale of safety products. (Honeywell's Statement of Undisputed Facts ("Def.'s SMF"), ¶ 21.)[1] Honeywell decided to introduce new safety products into the North American market and to devote resources to developing marketing and sales capabilities focused specifically on machine-guarding safety products. The parties refer to this Honeywell initiative as the "North American Safety Division Project;" we refer to it as the "Project."

In furtherance of the Project, Honeywell considered a number of options and potential plans for the distribution of its products. One of the distributors contacted during this process was Fox Controls, which was a distributor of Honeywell industrial and control products in Northern Illinois. (Def.'s SMF, ¶¶ 25-28.)[2] Honeywell then created a pilot distribution program to

---

[1] Many of plaintiff's responses to defendant's Local Rule 56.1 Statement, such as its response to ¶ 21, are "Denied as stated," followed by a recitation of a dispute as to certain aspects or portions of a given statement of fact. In many instances, the objections are to immaterial portions of statements. The portions of defendant's statements that are not controverted are deemed admitted. See N.D. Ill. Local Rule 56.1(a).

[2] Plaintiff's objections to these statements of fact are overruled, and its motion to strike defendant's supporting evidence for these statements, paragraphs 15-18 of the Declaration of Jeffrey T. Otterstein, is denied. Plaintiff argues that no evidence or additional documentation other than Mr. Otterstein's declaration establishes these facts. There need not be; Mr. Otterstein was the marketing manager for Honeywell's North American safety

evaluate potential safety distributors and determine the appropriate criteria for authorizing distributors in the safety category, which Honeywell referred to as the "Safety AD (Authorized Dealer) Pilot Program" (the "Pilot Program"). (Def.'s SMF, ¶ 32.)[3]

The parties characterize Fox Controls's role and relationship with Honeywell very differently. According to Fox Controls, its capabilities and expertise were well known to Honeywell before the Pilot Program was launched; it was authorized to sell Honeywell products as early as 1996; Honeywell brought in Fox Controls in 1997 to assist in developing the Pilot Program; Fox Controls was the first participant in the Pilot Program; and Fox Controls consulted extensively with Honeywell to help Honeywell establish a market in North America, including assisting in developing a business plan, training manual, distribution network, and product line. Honeywell, on the other hand, paints a picture in which Fox Controls was just one of several distributors and participants in the Pilot Program who worked with Honeywell to develop information for use in seminars and other marketing efforts and provided input

business at the time, and his declaration states that he has personal knowledge of the facts set forth therein. The fact that Otterstein may not have had as much firsthand experience with Fox Controls as other Honeywell employees is not a valid basis for striking his testimony. For the same reason, plaintiff's objection to, and its motion to strike, paragraphs 32, 47, and 48 of Mr. Otterstein's declaration is denied. Plaintiff's objection to, and motion to strike, paragraphs 6, 30, 35, and 39 of the declaration is denied as moot because we did not find those facts material and accordingly did not rely on them.

[3] Plaintiff denies this statement but does not appropriately controvert it with a denial of the substance of the statement or supporting materials. Rather, plaintiff simply expands upon the statement and adds its own facts. Therefore, the statement is deemed admitted.

into technical information prepared and used by Honeywell for its customers and employees.  We need not decide which characterization is more accurate, however, because these matters are simply the backdrop for plaintiff's claims, which relate to the specific product- and sales-training materials provided by Fox Controls to Honeywell.

In 1997, Fox Controls began to consult with Honeywell on product training.  In October 1997, the parties entered into a Joint Confidentiality Agreement (the "Confidentiality Agreement") governing their exchange of information.  It is undisputed that Fox Controls provided Honeywell with a number of documents over a period of a few years, including a Machine Control Flowchart for Interfacing Safety Designs (the "Flowchart") and a Regulatory Agencies Summary with Definitions Section ("the "Summary").  These documents, among others, were incorporated by Honeywell into training materials and manuals that Honeywell distributed at seminars.  Honeywell also developed its own product descriptions and technical descriptions, catalogs, and training materials, and sought input and feedback on those materials from Fox Controls and other participants and potential participants in the Pilot Program.

In March 1998, Samuel Boytor, the president of Fox Controls, sent a letter to Jeffrey Otterstein, the marketing manager for Honeywell's North American safety business, concerning the

development of a safety training manual for Honeywell.  The letter

stated in relevant part:

> Jeff:
>
> This is to clarify Fox Controls Inc.'s proposal to
> develop a segment of the safety training manual for use
> within the Honeywell Microswitch organization.  Fox
> Controls would like to outline the history of this
> proposal, beginning with the request of Jerry Westbrook
> of Ingersoll Milling, to develop some sort of a hands-on
> trainer to troubleshoot their Microswitch-related safety
> components and associated safety relays.
>
> Fox Controls Inc. spent a considerable amount of time
> conceiving, laying out, and proposing such a training
> module, as indicated in the various scenarios we
> presented to Carolyn Reifsteck of Honeywell Microswitch.
> In conjunction with this training module, we perceived it
> necessary to develop a training manual to accompany this
> trainer for the cost of $1,500.00 plus an estimated
> dollar amount of $75.00 per manual. Fox Controls Inc. in
> all scenarios was going to donate its engineering time
> and estimating time towards this project, and
> additionally, donate the training time to Ingersoll
> Milling to support the project.  We accept the
> responsibility as being a safety distributor but felt
> that Microswitch also had some financial responsibility
> in this project.
>
> Further meetings with Ingersoll's electricians clarified
> the fact that they did not feel they needed an elaborate
> training module that their engineering department
> required.  Instead, they wanted some components provided
> with explanations, which we are preparing to do for them.
>
> During this evaluation process of Ingersoll's needs,
> Honeywell Microswitch asked Fox Controls Inc. if they
> would be willing to develop a training manual for
> Honeywell's own use. Again, as in the past, we have been
> asked to identify and justify what we are selling in this
> manual.  We never intended this to be a proposal for
> Honeywell Microswitch from the onset, but you requested
> that we identify the content of the training manual.

**<u>Fox Controls Inc. Training Manual</u>**

This manual is broken down into three sections.
• Safety Components
• Safety Relays
• The relationship between safety components and safety relays
. . .

<u>Section 2: Safety Relays</u>
We will employ a training technique that Fox Controls Inc. has developed for safety relays. This is a color coded legend to clarify the terminal designations and functionality of safety relays. This can be part of Honeywell's training manual, but Fox Controls does not give Honeywell permission to use this technique in any of their other publications or documentation, as Honeywell did with Fox Controls Inc.'s "Machine Control Flowchart for Interfacing Safety Devices." . . .
. . .
The training manuals will be presented in three-ring binders and will be in workbook format. Notes and questionnaires will accompany each section.

(Letter from Sam Boytor to Jeff Otterstein, March 4, 1998 (the "March 1998 Letter"), Ex. I to Declaration of Jeffrey T. Otterstein.)

In August 1998, Honeywell responded to Mr. Boytor's proposal as follows:

Ref: Fox Controls, Inc. Training Manual

As per our meeting and discussions, here is a brief statement of work (SOW) for the training manual.

**<u>Objective;</u>** develop a training manual with three sections;
I. Honeywell's Safety Products
II. Honeywell's Safety Control Modules
III. Interfacing Circuitry, (e.g. safety inputs to safety control modules)
. . .
**<u>Deliverables/Milestones:</u>** A concept outline has been provided and is approved, thus work can be started. One

prototype manual is requested to be presented in a timely manner for Honeywell's review. A review period of one to two weeks will be needed after the manual is received. Upon approval, an order will be provided to purchase quantities of manuals as needed for training classes. 1998 Training class schedule; 8/31-9/2 and 10/19-23

**Cost:** Development cost; $1500. Individual manual purchase price to be determined at a later date.

**Comments:** The following assumptions apply;
1. Honeywell can use the training manual to train Honeywell employees and customers as needed.
2. Use of material will give credit to Fox Controls, Inc.
3. Revisions will follow an agreed to change control procedure and sign off process.
4. Request for reprint(s) will be made in writing to Fox Controls, Inc. for approval.
5. The signed join [sic] confidentially [sic] agreement applies.

(Letter from Jeff Otterstein to Sam Boytor, August 27, 1998 (the "August 1998 Letter"), Ex. I to Declaration of Jeffrey T. Otterstein.)

Shortly before the August Letter, Honeywell had sent Fox Controls a letter stating as follows:

This letter is to advise you that your company is being re-classified as a Vertical Market Industrial, Class M Authorized Distributor for MICRO SWITCH products effective 7-29-98. Brian Tarbox will be in contact with you shortly to discuss your new role, and answer any questions you may have relative to policy or procedures.

Attached is a copy of the MICRO SWITCH Authorized Distributor policy for your reference and files. Please review it carefully, since it answers many of the questions that arise during the normal course of business with MICRO SWITCH. . . .

(Letter from Thomas B. Landowski to Sam Boytor, July 24, 1998, Ex. G to Declaration of Jeffrey T. Otterstein.)   Honeywell refers to this letter as an "appointment" of Fox Controls "as a safety distributor," but it is clear that Fox Controls already was acting as an authorized distributor for Honeywell well before this date.[4]

In October 1998, Fox Controls participated in two sales seminars in conjunction with Honeywell.   Fox Controls provided Honeywell with the Flowchart and the Summary, which we have already mentioned, for use in the seminars.   Honeywell also used the Flowchart in a large product catalog that was distributed worldwide and posted on Honeywell's web site with other sales and product information.

Plaintiff contends that Mr. Boytor discovered in 2000 that Honeywell was using, at seminars, Fox Controls's "works" with Fox Controls's identifying marks removed.   Mr. Boytor states that he requested (of Mr. Otterstein) that Honeywell stop using his materials without permission, but Honeywell continued to use "those works."   (Declaration of Samuel G. Boytor, ¶¶ 13-14, Ex. 11 to Declaration of William L. Niro.)

According to Honeywell, beginning in 2001, its North American Safety Division suffered as a result of the general downturn in the economy.   Honeywell continued offering its safety products, but

---

[4]   Moreover, the letter states that Fox Controls was being "re-classified," which signifies that it had some sort of prior "classification."

determined in late 2001 that it would no longer invest in further product development and sales and marketing activities directed specifically at the safety product business.

In January 2002, plaintiff filed its original complaint in this action and has since filed three amended complaints. The Third Amended Complaint alleges six claims: copyright infringement (Counts I and II); violation of the Illinois Trade Secrets Act, 765 ILCS § 1065/1 et seq. (Count III); breach of contract (Count IV); quasi-contract/unjust enrichment (Count V); and quantum meruit (Count VI).

Honeywell now moves for summary judgment on all of plaintiff's claims.

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" <u>Talanda v. KFC Nat'l Mgmt. Co.</u>, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." <u>McGrath v. Gillis</u>, 44 F.3d 567, 569 (7th Cir. 1995).

## A.    <u>Copyright Infringement (Counts I & II)</u>

Plaintiff alleges that Honeywell infringed its copyright in the Flowchart (Count I) and the Summary (Count II). Honeywell contends that summary judgment against plaintiff should be granted on Counts I and II because by providing Honeywell with the Flowchart and Summary at Honeywell's request for use in Honeywell's product descriptions, plaintiff created a nonexclusive implied license that precludes the infringement claims. In addition, Honeywell argues that plaintiff cannot, as a matter of law, establish its claim for damages.

### 1.    <u>Implied License</u>

"A copyright owner may transfer to another person any of the <u>exclusive</u> rights the owner has in the copyright; however, such a transfer must be made in writing." <u>I.A.E., Inc. v. Shaver</u>, 74 F.3d 768, 774 (7th Cir. 1996). Section 101 of the Copyright Act excludes a nonexclusive license from the definition of a "transfer of copyright ownership." 17 U.S.C. § 101. By granting an implied

nonexclusive license, the creator of the work does not transfer ownership of the copyright to the licensee, but simply permits the use of a copyrighted work in a particular manner. A nonexclusive license may be granted orally or may be implied from conduct. See I.A.E., 74 F.3d at 775. "When the totality of the parties' conduct indicates an intent to grant such permission, the result is a legal nonexclusive license." Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc., 128 F.3d 872, 879 (5th Cir. 1997). "[T]he existence of a license, exclusive or nonexclusive, creates an affirmative defense to a claim of copyright infringement." I.A.E., 74 F.3d at 775 (affirming district court's grant of summary judgment to defendant on plaintiff's copyright claim where plaintiff "created a work at defendant's request and handed it over, intending that defendant copy and distribute it" (quoting Effects Assocs., Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990))).

An implied nonexclusive license arises where "(1) a person (the licensee) requests the creation of a work, (2) the creator (licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." Id. at 776. In I.A.E., the Seventh Circuit listed "several objective factors to guide the judicial inquiry as to whether an implied license exists: the language of the copyright registration certificate, the letter agreement, and deposition testimony; and the delivery of the

copyrighted material without warning that its further use would constitute copyright infringement." <u>Id.</u>

Honeywell argues that there is no genuine issue that Fox Controls granted it an implied nonexclusive license in the Flowchart and Summary. The evidence is that Fox Controls provided Honeywell with the Flowchart as part of training materials requested by Honeywell for use in describing Honeywell's products to its employees and customers. Mr. Boytor testified at his deposition that Fox Controls agreed "to provide training materials to [Honeywell] based on their needs, based on the products that they were going to market in this country" and "[o]n Honeywell's direction" and "per Jeff Otterstein's direction." (Deposition of Samuel G. Boytor, Ex. 2 to Declaration of William L. Niro ("Boytor Tr."), at 159-60.) Mr. Boytor was asked about a training manual that contained the Flowchart and answered as follows:

    Q.  So this was a manual that you created for
        Honeywell to provide to its customers?
    A.  Correct.
    . . .
    Q.  Is this, Defendant's Exhibit 6, the technical
        manual you were just talking about?
    A.  Yes.
    Q.  And that's the manual developed for Honeywell with
        the technical information to provide to its
        customers, correct?
    A.  Correct.

(Boytor Tr. at 121-122.) In addition, Mr. Boytor confirmed in his March 1998 Letter to Mr. Otterstein that Fox Controls was aware that Honeywell was using the Flowchart in its publications and

documentation. Fox Controls did not object to that use in the letter or warn that the use was a violation of copyright. As for the Summary, Mr. Boytor testified at his deposition that plaintiff provided it to Honeywell as part of training manuals used in the October 1998 seminars. (Boytor Tr. at 161-62.) There is no evidence that either the Flowchart or the Summary were provided with any warning that further use would constitute copyright infringement.

Fox Controls contends that there are genuine issues of material fact regarding the creation of the Flowchart and Summary. Fox Controls first points to the March 28, 2002 copyright registration certificate for the Flowchart, which states that the "year in which creation of this work was completed" was 1990 (Ex. 13 to Declaration of William L. Niro), years before Fox Controls's collaboration with Honeywell.[5] Plaintiff also asserts that there is no evidence that the Summary was prepared at Honeywell's request. Accordingly, says plaintiff, "there is at minimum a factual dispute regarding the circumstances surrounding the creation and delivery of copies to Honeywell." (Opposition to Motion for Summary Judgment ("Opposition") at 3.) We disagree. There is no genuine issue that Honeywell requested creation of the training and sales manuals, which <u>contained</u> the Flowchart and

---

[5]/ The copyright in the Flowchart (and Summary) was registered after the commencement of this lawsuit.

Summary, and that Fox Controls created the manuals and provided them to Honeywell. Thus, plaintiff impliedly gave Honeywell a license to use the Flowchart and Summary, insofar as they were incorporated into the manuals.

Fox Controls argues that there is an issue of material fact regarding its intent that Honeywell copy and distribute the works. Fox Controls maintains that it was not paid for and did not intend for Honeywell to copy and distribute the manuals for use beyond training and sales seminars. According to plaintiff, "Honeywell went on to make and distribute up to 500 copies of the [Summary], included the Flow Chart in over 37,000 sensing and control product catalogs which it distributed worldwide, and posted the Flow Chart on its catalogue web site for anyone to access and download." (Opposition at 3.) Plaintiff submits evidence that Honeywell incorporated the Flowchart into 1999 and 2000 safety products training manuals and removed Fox Controls's name. Honeywell admits that it used the Flowchart in its 1999 and 2000 catalogs (and omitted Fox Controls's name from the Flowchart).

The essence of plaintiff's argument is that even if an implied license was granted in the Flowchart and Summary for use at training and sales seminars, Honeywell exceeded the scope of the license. As the Seventh Circuit noted in <u>I.A.E.</u>, when analyzing the issue of intent to grant an implied license, the relevant intent is not subjective intent, but the outward manifestation of

it.  74 F.3d at 777 (citing Indiana contract law).[6]  One
manifestation of the scope of the implied license that plaintiff
intended to grant to Honeywell is found in the March 1998 and
August 1998 Letters between Mr. Boytor and Mr. Otterstein.  Their
content, quoted supra, creates a genuine issue of fact as to the
purposes for which Fox Controls intended Honeywell to use the
Flowchart and Summary.  Neither of the letters is a model of
clarity, much like the general nature of the relationship between
the parties.  But the letters do show Fox Controls's intent that
Honeywell order "reprints" of the manual, and that "credit" be
given to Fox Controls for the creation of the materials.  These
statements evidence plaintiff's intent that Honeywell refrain from
using versions of the material that omit Fox Controls's name and
that Honeywell pay Fox Controls for additional copies of the
manual.

On the other hand, the August 1998 Letter contemplates that
Honeywell can broadly "use the training manual to train Honeywell
employees and customers as needed."  Whether such use included the
use of the materials in Honeywell's catalog and on its web site is
a factual issue that we cannot resolve on summary judgment.  To
complicate matters, Mr. Boytor states cryptically in the March

_____

[6] This is a general principle of contract law.  "[I]t is not the real
intent but the intent expressed or apparent . . . which is sought; it is the
objective, not the subjective, intent that controls."  11 Richard A. Lord,
Williston on Contracts § 31:4 (4th ed.)

Letter regarding the safety-relay training technique to be included in the manuals: "This can be part of Honeywell's training manual, but Fox Controls does not give Honeywell permission to use this technique in any of their other publications or documentation, as Honeywell did with Fox Controls Inc.'s "'Machine Control Flowchart for Interfacing Safety Devices.'" (March 1998 Letter at 2.) This statement shows plaintiff's awareness and, by negative implication, possible acquiescence in, Honeywell's use of the Flowchart in "other publications and documentation."

To summarize, we hold that there is no genuine issue that plaintiff granted Honeywell an implied license in the Flowchart and Summary, but that there is a genuine issue as to the scope of that implied license.

## 2. **Damages**

Honeywell contends that summary judgment should be granted on plaintiff's copyright claims for the additional reason that plaintiff cannot establish damages. Although plaintiff seeks injunctive relief in addition to damages on Counts I and II, thus precluding "complete" summary judgment on these claims, we agree with defendant that plaintiff has failed to come forth with evidence to support an award of damages.

Honeywell first argues that plaintiff has no claim for statutory damages because there is no evidence that Honeywell used the Flowchart or the Summary after the effective date of the

copyright registration--March 28, 2002. As a matter of law, statutory damages or attorney's fees are not available where the alleged infringement commenced before the effective date of the copyright registration. See Budget Cinema, Inc. v. Watertower Assocs., 81 F.3d 729, 733 (7th Cir. 1996) (citing 17 U.S.C. § 412). Plaintiff concedes that it is not entitled to statutory damages for infringement prior to March 28, 2002, but argues that it is "entitled to elect statutory damages for Honeywell's use of the copyrighted works after that date." (Opposition at 7.)

Plaintiff is wrong. The Copyright Act specifically provides that "no award of statutory damages or of attorney's fees . . . shall be made for any infringement of copyright in an unpublished work commenced before the effective date of its registration." 17 U.S.C. § 412 (emphasis added); see also X-It Prods., L.L.C. v. Walter Kidde Portable Equip., Inc., 227 F. Supp. 2d 494, 527-28 (E.D. Va. 2002) ("[A] plaintiff is not entitled to recover statutory damages, which include costs and attorneys' fees, for any infringement of plaintiff's copyright that commenced prior to the effective date of copyright registration, regardless of whether the infringement continues after the effective date of copyright registration."). There is no genuine issue that the alleged infringement here commenced prior to March 28, 2002; therefore, statutory damages and attorney's fees are not available as a matter of law.

Honeywell asserts that plaintiff's claim for actual damages also fails. Plaintiff contends that it can prove either its own lost profits or the "value of use" of the copyrighted works to Honeywell. Alternatively, plaintiff argues that it is entitled to recover Honeywell's profits attributable to the purported infringement.

"The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). We will examine each of plaintiff's theories in turn, beginning with the "profits accrued by Honeywell" approach.

To obtain an award of a defendant's profits, a plaintiff bears the burden of connecting profits directly to the purported infringement. See 4 Melville B. Nimmer & David Nimmer, Nimmer On Copyright § 14.03[A] (2004) (hereinafter "Nimmer") (citing Taylor v. Meirick, 712 F.2d 1112, 1122 (7th Cir. 1983) ("It was not enough to show [defendant's] gross revenues from the sale of everything he sold, which is all, really, that [plaintiff] did. If General

Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits.")). Plaintiff incorrectly maintains that "[g]ross revenues from Honeywell's North American Safety Division provide a reasonable approximation of the amount of damages attributable to the infringing material." (Opposition at 8.) Plaintiff fails to present any basis upon which to conclude that Honeywell derived *any* profit from the use of plaintiff's works, much less any particular amounts. Plaintiff also fails even to argue that any particular percentage of defendant's revenues is attributable to the Flowchart and Summary. The evidence offered by plaintiff regarding "[s]ales of [all] safety products by Honeywell in the relevant time period 1998-2003" is insufficient to create a triable issue of fact. A plaintiff cannot simply presume that the sales of a defendant's products are due to copyright infringement. See Taylor, 712 F.2d at 1122; University of Colo. Found., Inc. v. American Cyanamid Co., 196 F.3d 1366, \1375 (Fed. Cir. 1999); Mackie v. Rieser, 296 F.3d 909, 915-16 (9th Cir. 2002).

Plaintiff contends that, alternatively, it can prove "actual damages suffered," which are measured by the profits plaintiff lost due to infringement or by the value of use of the copyrighted work to the infringer. See Deltak, Inc. v. Advanced Sys., Inc., 767 F.2d 357, 363 (7th Cir. 1985). According to plaintiff, it has

"direct evidence of its sales falling dramatically after Honeywell began copying and distributing its proprietary work and excluding Fox from participation in sales seminars. Fox's revenues fell from $5,690,000 in year 2000 to $1,600,000 in year 2001, the year in which Fox notified Honeywell of its infringement and began asserting its rights." (Opposition at 9.) Plaintiff continues: "The finder of fact could directly link Fox's lost sales (and profits) to Honeywell's infringing activities." (Id.) Because plaintiff does not elaborate on this statement or offer any evidence at all that could form a basis for this "direct link," the argument is rejected. See 4 Nimmer § 14.02[A][1] (plaintiff has burden of establishing with reasonable probability the existence of a causal connection between the infringement and the lost revenue).

Plaintiff's alternative basis for actual damages is the "value of use" of the Flowchart and Summary to Honeywell. The "value of use" approach requires a determination of the fair market value of an infringed work. See Deltak, 767 F.2d at 363. As with its other damages arguments, plaintiff is fatally vague, arguing merely that "one can reasonably conclude that Honeywell received some 'value' or market advantage by exploiting Mr. Boytor's work, or else it would not have done so, nor continue to do so when told to stop." (Opposition at 10.) The problem is that plaintiff does not present any evidence upon which a determination of the fair market value of

the Flowchart and Summary could be based (nor does it even attempt to conclusorily argue their fair market value).[7]

Plaintiff has not presented any evidence to create a triable fact issue on damages. Accordingly, if plaintiff is able to prove that defendant went beyond the scope of the implied licenses with respect to Count I and II, its remedies will be limited to injunctive relief.

**B.  Trade Secret Misappropriation (Count III)**

Count III is a claim for misappropriation of trade secrets in violation of the Illinois Trade Secrets Act. Plaintiff alleges that in reliance upon the Confidentiality Agreement entered into by the parties, it disclosed its trade secrets to Honeywell, which then misappropriated those trade secrets by disclosing them to plaintiff's competitors without plaintiff's consent.

Honeywell asserts that the Confidentiality Agreement's restriction on Honeywell's use of any information provided by Fox Controls applies only to information that Fox Controls designated

---

[2]  We also note that plaintiff contends that the evidence of Honeywell's use of the works is "extensive," but the cited evidence (Mr. Otterstein's Deposition) does not clearly support this proposition. According to plaintiff, there were "up to 500 copies of the works distributed in safety sales seminars between 1999 and 2001; 37,000 catalogues distributed worldwide since 2000; and 4.5 million hits on the Honeywell website containing Fox's copyrighted work." (Opposition at 9.)  Mr. Otterstein's testimony in the cited portions of the deposition, however, does not support this statement. Mr. Otterstein stated that there were "200 to 500" copies of seminar documents distributed and that there were 25,000 catalogs and possibly 700 more (the questions and answers regarding the amount over 25,000 are unclear). As for the number of "hits" on Honeywell's website, those "hits" on Honeywell's website, which is made up of many individual pages, do not necessarily reflect how many viewers looked at the Flowchart and the Summary.

in writing as confidential or proprietary and that Fox Controls never so designated any of the materials. The Confidentiality Agreement provides in pertinent part:

> **WHEREAS**, both HONEYWELL and FOX possess information relating to **SAFETY CIRCUITS, PRODUCTS, APPLICATIONS, DOCUMENTS AND OTHER SAFETY RELATED INFORMATION** which they consider their intellectual property (hereinafter referred to as "CONFIDENTIAL INFORMATION"); and

> . . .

> **WHEREAS**, HONEYWELL and FOX are willing to communicate CONFIDENTIAL INFORMATION to the other party for said purpose upon the terms and conditions hereinafter set forth; and

> **WHEREAS**, each party agrees to the terms and conditions set forth below when acting as a communicator (hereinafter referred to as INFORMATION PROVIDER) of its own CONFIDENTIAL INFORMATION or as a recipient (hereinafter referred to as INFORMATION RECEIVER) of the other party's confidential information.

> **NOW THEREFORE**, it is hereby agreed as follows:

> 1. INFORMATION RECEIVER will use the CONFIDENTIAL INFORMATION for the purpose of **DISCUSSING METHODS OF EDUCATION** [sic] **HONEYWELL'S CUSTOMERS ON SAFETY RELATED ISSUES, IMPROVING HONEYWELL'S PRODUCTS, PROCESSES, DOCUMENTATION AND BEST PRACTICES IN REGARDS TO SAFETY ISSUES** (hereinafter referred to as "PURPOSE") and no other use or exploitation of the CONFIDENTIAL INFORMATION by INFORMATION RECEIVER . . . is permissible. Neither INFORMATION RECEIVER nor its employees, officers or directors will, without prior written consent of INFORMATION PROVIDER, disclose or distribute the CONFIDENTIAL INFORMATION or cause the CONFIDENTIAL INFORMATION to be disclosed or distributed to any third party other than employees, officers or directors of INFORMATION RECEIVER to whom such disclosure is necessary for the PURPOSE. . . .

> 2. The limitations imposed by Paragraph 1 shall not apply to:

. . .
      (v)   written information, which is not marked with an appropriate legend identifying it as proprietary or confidential; . . .

(Confidentiality Agreement at 1-2, Ex. E to Declaration of Jeffrey T. Otterstein.)

There is no dispute that the materials provided by Fox Controls to Honeywell were not marked with the words "proprietary" or "confidential" or any similar words or phrases. But plaintiff contends that "[e]very document that Fox Controls provided to Honeywell was clearly marked with an identifying 'Fox Controls' logo, and/or included its address and contact information." (Opposition at 11.) In plaintiff's view, that marking is an "appropriate legend" to identify the material as "proprietary" under the Confidentiality Agreement.

The word "proprietary" means "held as the property of a private owner" or "belonging to a proprietor." <u>Webster's Third New International Dictionary</u> 1819 (1971). A "proprietor" is defined as "one who has the legal right or exclusive title to something whether in possession or not: OWNER." <u>Id.</u> At best, the placement of Fox Controls's logo and address on the documents it provided to Honeywell signifies the source; it does not designate the materials as belonging exclusively to Fox Controls. It is worth noting that plaintiff's argument concerning the Fox Controls logo appears to be an afterthought, given plaintiff's response to one of Honeywell's

Requests to Produce. Well into the progress of this case, Honeywell requested "[c]opies of any and all documents submitted to Honeywell by Fox Controls marked with a legend identifying it as 'confidential' and/or 'proprietary' since 1995." Plaintiff responded: "Plaintiff has not located any responsive documents; investigation continues." (Plaintiff's Response to Request to Produce No. 46, Ex. A to Declaration of Troy B. Klyber in Support of Honeywell's Reply.) Plaintiff's current argument that "[e]very document that Fox Controls provided to Honeywell was clearly marked" with a legend identifying it as proprietary conflicts with this earlier statement, especially considering that these are plaintiff's own documents.

Because there is no genuine issue that the documents provided to Honeywell pursuant to the Confidentiality Agreement were not identified by plaintiff as proprietary or confidential, summary judgment for Honeywell will be granted on Count III.

**C.** **Breach of Contract (Count IV)**

Fox Controls alleges the following in Count IV:

By virtue of (a) the parties [sic] written agreements, including the [Confidentiality Agreement, the March 1998 Letter, and the August 1998 Letter]; (b) the various oral agreements reached between the parties as set forth above; (c) Honeywell's actions and conduct; and (d) the parties' course of dealing; the parties reached an agreement between them which was part written, part oral, part expressed and part implied, that Fox Controls would be compensated for the work that it performed on behalf of Honeywell in the following manner:

a.    Fox Controls was to be paid a reasonable and
      customary fee for the "consulting" services
      that it was "hired"[8] to perform for Honeywell,
      including the work performed by Fox Controls
      with respect to the North American Safety
      Division Project and the GM Shanghai Project;

b.    Fox Controls would receive $1,500.00 for its
      initial training manual and at least $75.00
      per copy thereafter; and

c.    After the North American Safety Division was
      established, Fox Controls was to be appointed
      as one of only a select few "safety
      distributors" of Honeywell's safety product
      line and that as a "safety distributor," Fox
      Controls was to enjoy the right to either (i)
      sell safety product to all sub-distributors in
      North America or (ii) to receive an override
      on all North American sales of safety
      products.

(Third Amended Complaint, ¶ 36.)

Honeywell first argues that summary judgment should be entered
in favor of Honeywell as to the claim for $1,500 plus $75 per copy
relating to training manuals and as to the claim for any "override"
on sales of safety products because plaintiff offers no supporting
evidence.   We agree.   As for the manuals, plaintiff submits no
evidence (nor does plaintiff even argue) that it ever provided
training manuals pursuant to the 1998 exchange of letters.   In
fact, Mr. Boytor testified at his deposition that Fox Controls had
provided training manuals pursuant to earlier oral consulting
agreements. (Boytor Tr. at 158-160.)   As for an "override" on all

_____

[8]/   We are puzzled as to why <u>plaintiff</u> would place quotation marks around
the word "hired," or, for that matter, "consulting."

sales of safety products, the only evidence of Honeywell's agreement to any type of override is Mr. Boytor's Declaration, in which he states that Honeywell (orally) agreed to compensate Fox Controls for "integration engineering services" "on a combination of hourly fees and on an override basis for all Honeywell projects for which Fox provided integration engineering services." (Declaration of Samuel G. Boytor, ¶ 23, Ex. 11 to Declaration of William L. Niro.) Plaintiff does not submit evidence that it is entitled to any particular overrides, though, and does not provide or even cite to evidence that it provided "integration engineering services" that would qualify for overrides. It is telling that plaintiff's response brief wholly fails to respond to Honeywell's argument regarding either the training manual fees or the overrides and only addresses Honeywell's argument regarding the Authorized Distributor Policy, which is discussed <u>infra</u>. We hold that there is no genuine issue pertaining to the portions of plaintiff's breach of contract claim set forth in paragraphs 36(b) and (c)(ii) of the Third Amended Complaint; as a matter of law, Honeywell is not liable to plaintiff for breach of contract for a one-time fee of $1,500 plus $75 per copy of a training manual, and Honeywell is not liable to plaintiff for any "overrides."

Honeywell further contends that summary judgment should be entered in its favor as to plaintiff's claim for compensation at an hourly rate under the alleged oral agreements. According to

Honeywell, even taking plaintiff's allegations as true, the terms and conditions of the Authorized Distributor Policy (the "ADP") it sent to Fox Controls in July 1998 supersede any prior oral agreements.[9]  The problem with this contention is that there is no evidence that the ADP is a contract or that plaintiff agreed to its terms.  The ADP was not signed by Fox Controls, nor did it even call for a signature; it merely appears to be Honeywell's unilateral expression of its policy.  And even if the ADP could be considered an agreement between the parties, by its terms it would not apply to a claim for compensation for any consulting services provided by plaintiff to Honeywell.  The ADP states that it "defines the relationship between MICRO SWITCH, a division of Honeywell Inc., and its Authorized Distributors, applying to all products and services sold by MICRO SWITCH to its distributors." (ADP at 1, Ex. H to Declaration of Jeffrey T. Otterstein.)  The ADP does not purport to apply to services provided to Honeywell by a distributor.

Honeywell's motion for summary judgment on Count IV insofar as it relates to the claim for consulting services will be denied.

## D.  Quasi-Contract Claims (Counts V & VI)

---

[9]  The ADP provides: "The terms and conditions constitute the entire agreement between MICRO SWITCH and the Distributor, superseding all prior agreement or understandings, written or oral, and cannot be amended except by mutual writing."  (ADP at 2, Ex. H to Declaration of Jeffrey T. Otterstein.)

Count V is a claim for "quasi contract-unjust enrichment," and Count VI is a quantum meruit claim. Honeywell does not argue that plaintiff cannot prove these alternative theories to its contract claim, but simply that these claims are "barred by plaintiff's contracts with Honeywell." According to Honeywell, because "both parties agree that the[ir] relationship was contractual," there can be no claims for quasi-contract. (Memorandum in Support of Motion for Summary Judgment at 14.) The parties do not agree, however, on the nature or scope of the contractual relationship. And while plaintiff, as it concedes, cannot ultimately <u>recover</u> in both contract and quasi-contract, proceeding on alternate theories is permissible. Defendant's motion for summary judgment therefore will be denied as to Counts V and VI.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part.

As to Counts I and II of the Third Amended Complaint, we hold that there is no genuine issue that plaintiff did grant Honeywell an implied license in the Flowchart and Summary, but that there is a genuine issue as to the scope of that implied license. In addition, we hold that if plaintiff is able to prove that defendant went beyond the scope of the implied license with respect to Count I and II, plaintiff's remedies will be limited to injunctive relief.

Summary judgment against plaintiff and in favor of defendant is granted on Count III.

As to Count IV, we hold that there is no genuine issue pertaining to the portions of plaintiff's breach of contract claim set forth in paragraphs 36(b) and (c)(ii) of the Third Amended Complaint; as a matter of law, Honeywell is not liable to plaintiff for breach of contract for a one-time fee of $1,500 plus $75 per copy of a training manual, and Honeywell is not liable to plaintiff for any "overrides." The remainder of defendant's motion as it pertains to Count IV is denied.

Defendant's motion is denied as to Counts V and VI.

A status hearing is set for July 27, 2005, at 10:30 a.m., to set the case for trial.


DATE:     July 14, 2005



ENTER:    _____

          John F. Grady, United States District Judge